## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| FEDEX SUPPLY CHAIN LOGISTICS<br>& ELECTRONICS, INC., | ) <br>) <br>) |
| Plaintiff, | ) <br>) |
| | ) Civil Action No. 3:23-cv-02397 |
| v. | ) <br>) |
| JAMES E. GOODMAN, JR., *et al.*, | ) <br>) |
| Defendants. | ) <br>) |

---

### PLAINTIFF'S OMNIBUS RESPONSE IN OPPOSITION TO
### MOTIONS TO DISMISS [DKT. NOS. 161, 165, 166, 168, 171 and 173]
### AND INCORPORATED MEMORANDUM OF LAW

---

### BUTLER SNOW LLP

By: /s/ Daniel W. Van Horn
DANIEL W. VAN HORN  (Pro Hac Admitted)
S. Keenan Carter (TX Bar No. 24006966)
R. CAMPBELL HILLYER (Pro Hac Admitted)
ADAM M. LANGLEY (Pro Hac Admitted)
KATHERINE KUCHENBECKER (Pro Hac
Admitted)
6075 Poplar Ave., Ste. 500
Memphis, TN 38119
(901) 680-7200
(901) 680-7201 (fax)
Danny.VanHorn@butlersnow.com
Keenan.Carter@ButlerSnow.com
Cam.Hillyer@butlersnow.com
Adam.Langley@butlersnow.com
Katherine.Kuchenbecker@butlersnow.com

SAYLES LAW FIRM
RICHARD A. SAYLES
Texas Bar No. 17697500
dsayles@sayleslawfirm.com
5600 W. Lovers Lane, Suite 116-363
Dallas, Texas 75209
(214) 643-8030 (Telephone)

FEDERAL EXPRESS CORPORATION
JASON R. BERNHARDT
Texas Bar No. 24045488
jasonbernhardt@fedex.com
3620 Hacks Cross Road, Building B
Memphis, Tennessee 38125
(901) 434-3213 (Telephone)
(901) 434-9279 (Fax)

**COUNSEL FOR PLAINTIFF FEDEX SUPPLY CHAIN LOGISTICS & ELECTRONICS, INC.**

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the foregoing motion has been served on all counsel of record via the Court's CM/ECF system this the 30th day of September 2024 upon:

By: */s/ Daniel W. Van Horn*

**TABLE OF CONTENTS**

CERTIFICATE OF SERVICE ............................................................................... 2

TABLE OF AUTHORITIES .............................................................................. iii

INTRODUCTION & SUMMARY OF ARGUMENT ..................................................... 1

LAW AND ARGUMENT ................................................................................. 8

I.   FSCLE More Than Adequately Pled its RICO Claims. ....................................... 8

   A. FSCLE Has Pled a Pattern of Racketeering Activity ...................................... 9

   B. FSCLE Has Pled the Existence of An Enterprise. ........................................ 21

   C. Joint and Several Liability of the Members of the Enterprise. ........................ 24

II.  FSCLE Adequately Pled its Claims Under the Texas Theft Liability Act and
     Common Law Theft. ............................................................................. 25

III. FSCLE Adequately Pled its Unjust Enrichment Claim. ...................................... 26

IV.  FSCLE Adequately Pled its Fraud Claims. ................................................... 27

V.   FSCLE Adequately Pled its Tortious Interference Claim. ................................... 28

VI.  FSCLE Adequately Pled its Conspiracy Claim. ............................................. 30

VII. The Economic Loss Doctrine Is No Bar to FSCLE's Claims. ............................... 31

VIII. Prosperity Bank's Liability to FSCLE as Assignee of the Goodman Networks
     Bankruptcy Estate. ............................................................................. 33

IX.  Goodman Networks is Not a Necessary Party. ............................................... 35

X.   The Claims Against Judith Auerbach are Timely Filed. ..................................... 37

XI.   The Court Has Personal Jurisdiction Over All Defendants. .................................................. 37

CONCLUSION ...................................................................................................................................... 38

## **TABLE OF AUTHORITIES**

### CASES

*A. Benjamini, Inc. v. Dickson*,
  2 S.W.3d 611 (Tex. App.—Houston [14th Dist.] 1999, no pet.) ............................................ 11

*AAB Logistics, Inc. v. Forward Air, Inc.*,
  2016 WL 8672773 (N.D. Tex. Nov. 18, 2016) ....................................................... 1, 10, 25, 32

*Abraham* v. *Singh*,
  480 F.3d 351, 356 (5th Cir. 2007) ........................................................................................ 19

*Adhikari v. Daoud & Partners*,
  697 F.Supp.2d 674 (S.D.Tex.2009) ...................................................................................... 22

*Agar Corp Inc. v. Electro Cirs, Int'l, LLC*,
  580 S.W.3d 136, 141 (Tex. 2019) ........................................................................................ 30

*Allstate Ins. Co. v. Michael Kent Plambeck, D.C.*,
  2014 WL 1303000 (N.D. Tex. Mar. 31, 2014) ..................................................................... 22

*Amoco Prod. Co. v. Smith*,
  946 S.W.2d 162 (Tex. App.—El Paso, 1997, no writ) ......................................................... 27

*Boyle v. United States*,
  556 U.S. 938 (2009) .............................................................................................................. 22

*Bradley v. Phillips Petroleum Co.*,
  527 F.Supp.2d 625 (S.D. Tex. 2007) .................................................................................... 11

*Brown v. Johnson & Johnson*,
  2012 WL 2134304 (N.D. Tex. Apr. 19, 2012) ..................................................................... 37

*Burlington Northern R.R. Co. v. Southwestern Elec. Power Co.*,
  925 S.W.2d 92, 101 n.5 (Tex. App.—Texarkana 1996, no writ) .......................................... 27

*Cartwright v. Ghattas*,
  2010 WL 11506415 n.6 (W.D. Tex. March 16, 2010) .......................................................... 24

Cmty. Health Sys. Pro. Sers. Corp. v. Hansen, 525 S.W. 3d 671 (Tex. 2017) ........................... 28

*Com. Metals Co. v. Chazanow*,
  2009 WL 3853704 (N.D. Tex. Nov. 17, 2009) ..................................................................... 20

*Compass Bank v. Villarreal*,
  2011 WL 1740270 (S.D. Tex. May 5, 2011) ........................................................................ 26

*Cosmos Forms Ltd. v. Guardian Life Ins. Co. of Am.*,
  113 F.3d 308 (2d Cir. 1997) ................................................................................................. 20

*Cypress/Spanish Ft. 1, L.P. v. Pro Serv. Indus., Inc.*,
  814 F.Supp.2d 698 (N.D. Tex. 2011) .............................................................................. 19, 20

*D&T Partners, L.L.C. v. Baymark Partners Mgmt., L.L.C.*,
98 F.4th 198 (5th Cir. 2024) ................................................................ 18, 19, 20, 21

*D'a Petro., LLC v. Buster*, 2020 U.S. Dist. LEXIS 262937 (N.D. Tex. Aug. 17, 2020) ............ 11

*DHI Group, Inc. v. Kent*, 397 F. Supp. 3d 904 (S.D. Tex. 2019) ................................. 19

*Doss v. Homecoming Financial Network, Inc.*,
210 S.W.3d 706 (Tex. App.—Corpus Christi 2006, pet. denied) ............................ 27

*E. Poultry Distribs., Inc. v. Puez*,
2001 U.S. Dist. LEXIS 27007 (N.D. Tex. Dec. 3, 2001) .......................................... 1

*Elliott v. Foufas*, 867 F.2d 877 (5th Cir.1989) ...................................................... 22

*Essilor International SAS v. JP Morgan Chase Bank, N.A.*,
650 F.Supp.3d 62  (S.D.N.Y. 2023) ....................................................................... 34

*First Nat'l Bank & Trust Co. v. Hollingsworth*,
931 F.2d 1295 (8th Cir. 1991) ............................................................................... 19

*H.J. Inc. v. Nw. Bell Tell. Co.*,
492 U.S. 229 (1989) ...................................................................................... passim

*Hewlett-Packard Co. v. Byd:Sign, Inc.*,
2007 WL 275476 (E.D. Tex. Jan. 25, 2007) ................................................... 19, 20

*Holloway v. Skinner*, 898 S.W.2d 793 (Tex. 1995) ................................................ 29

*Hood ex rel. Ms. v. City of Memphis, Tn.*,
570 F.3d 625 (5th Cir. 2009) ................................................................................ 35

*HS Res., Inc. v. Wingate*, 327 F.3d 432 (5th Cir. 2003) ...................................... 35, 36

*Hunt v. Baldwin*,
68 S.W.3d 117 (Tex. App.—Houston [14th Dist.] 2001, no pet.) ........................... 27

*In re Burzynski*, 989 F.2d 733 (5th Cir.1993) ................................................ 8, 9, 17, 21

*Landry v. Airline Pilots Ass'n Intern. AFL-CIO*,
901 F.2d 404 (5th Cir. 1990) ................................................................................ 11

*Liquid Air Corp. v. Rogers*,
834 F.2d 1297 (7th Cir. 1987) ......................................................................... 19, 20

*Matter of Approximately $80,600.00*,
537 S.W.3d 207 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) ..................... 11

*Matter of Okedokun*,
968 F.3d 378 (5th Cir. 2020) ................................................................................ 10

*Regalado Cuellar v. United States*,
553 U.S. 550 (2008) ............................................................................................. 13

*Resol. Trust Corp. v. Stone*,
998 F.2d 1534 (10th Cir. 1993) ............................................................................ 19

*Reves v. Ernst & Young*, 507 U.S. 170 (1993) ....................................................... 24

*Rolls-Royce Corp. v. Heros, Inc.,*
    576 F.Supp. 2d 765 (N.D. Tex. 2008) ........................................................ 37

*Sinclair Houston Fed. Credit Union v. Hendricks,*
    268 S.W.2d 290 (Tex. Civ. App.—Galveston 1954, writ ref'd n.r.e.) .................... 11

*Sonnier v. State Farm Mut. Auto Ins. Co.,*
    509 F.3d 673 (5th Cir. 2007) ............................................................... 1

*St. Paul Mercury Ins. Co. v. Williamson,*
    224 F.3d 425 (5th Cir. 2000) ...................................................... 8, 22, 23

*Staats v. Miller,*
    150 Tex. 581, 243 S.W.2d 686 (Tex.1951) ................................................ 27

*Taylor Pipleine Const., Inc. v. Directional Rd. Boring, Inc.,*
    438 F.Supp.2d 696 (E.D. Tex. 2006) ...................................................... 25

*Taylor v. State,*
    450 S.W.3d 528 (Tex. Crim. App. 2014) ......................................... 1, 10, 25

*Teachers Credit Union v. Hernandez,*
    814 S.W.2d 195 (Tex. App. –San Antonio 1991, no writ) .................................. 28

*Texas Brand Bank v. Luna & Luna*, LP,
    2015 WL 12916411 (N.D. Tex. Feb. 27, 2015) ............................................. 34

*TIB--The Indep. BankersBank v. Canyon Cmty. Bank,*
    13 F. Supp. 3d 661 (N.D. Tex. 2014) ..................................................... 26

*U.S. v. Anderson,*
    174 F.3d 515 (5th Cir. 1999) .............................................................. 14

*U.S. v. Hanafy,*
    124 F.Supp.2d 1016 (N.D. Tex. 2000) ..................................................... 14

*U.S. v. Pendleton,*
    761 Fed. Appx. 339 (5th Cir. 2019) ....................................................... 13

*U.S. v. Phillip Morris USA,*
    316 F.Supp.2d 19 (D.D.C. 2004) .......................................................... 24

*U.S. v. Saks,*
    964 F.2d 1514 (5th Cir. 1992) ............................................................ 12

*U.S. v. Thompson,*
    2001 WL 498430 (5th Cir. Apr. 9, 2001) .................................................. 19

*Uniroyal Goodrich Tire Co. v. Mut. Trading Corp.,*
    63 F.3d 516 (7th Cir. 1995) .............................................................. 20

*United Healthcare Servs., Inc. v. Next Health, LLC,*
    2021 WL 764035 (N.D. Tex. Feb. 26, 2021) ............................................... 19

*United States v. Elliott,*
    571 F.2d 880 (5th Cir.1978) ......................................................... 21, 22

*United States v. Faulkner,*
    584 F.Supp.3d 180 (N.D. Tex. 2022) ............................................ 11

*United States v. Hawes,*
    529 F.2d 472 (5th Cir.1976) ......................................................... 21

*United States v. Hively,*
    437 F.3d 752 (8th Cir. 2006) ........................................................ 19

*Wells Fargo Bank, N.A. v. Sutherland,*
    2017 WL 7052266 (W.D. Tex. Nov. 28, 2017) ............................. 28

*Word of Faith World Outreach Center Church, Inc. v. Sawyer,*
    90 F.3d 118 (5th Cir. 1996) ............................................... 9, 15, 17

*Xie Law Offices, LLC v. Nguyen & Chen, LLP,*
    2018 WL 3468718 (S.D. Tex. June 28, 2018) ............................... 36

## FEDERAL REGULATIONS

18 U.S.C. § 1344 ................................................................................ 12

18 U.S.C. § 1956 ................................................................................ 13

18 U.S.C. § 1961 .................................................................................. 9

18 U.S.C. § 1961(3) .............................................................................. 8

18 U.S.C. § 1961(4) ............................................................................ 22

18 U.S.C. § 1962(a)-(d) ........................................................................ 8

18 U.S.C. § 1965(b) ............................................................................ 37

28 U.S.C. § 1344 ................................................................................ 12

Tex. Bus. & Com. Code § 4A.202 ...................................................... 34

Tex. Penal Code § 31.03(b)(1) ............................................................ 26

## FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. Civ. P. 12(b)(7) ...................................................................... 35

Fed. R. Civ. P. 15(c) ........................................................................... 37

Fed. R. Civ. P. 19(a) .................................................................... 35, 36

Fed. R. Civ. P. 19(b) ........................................................................... 36

Plaintiff FedEx Supply Chain Logistics & Electronics, Inc. ("Plaintiff" or "FSCLE") for its Omnibus Response in Opposition to the Motions to Dismiss [Dkt. #s 161, 165, 166, 168, 171 and 173] states as follows:

## INTRODUCTION & SUMMARY OF ARGUMENT

Defendants' Motions to Dismiss are really attempts to argue the merits of this dispute. The motions fail because they ignore the actual (and very) detailed facts pled in the Third Amended Complaint ("TAC"). Defendants' motions are thus procedurally improper at this stage of the case as the Court must accept the facts as pled by FSCLE. *Sonnier v. State Farm Mut. Auto Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007); *E. Poultry Distribs., Inc. v. Puez,* No. 3:00-CV-1578-M, 2001 U.S. Dist. LEXIS 27007, at *3-4 (N.D. Tex. Dec. 3, 2001) ("a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.").

The actual facts pled show that Defendants stole tens of millions from FSCLE by sending FSCLE more than 1,600 invoices, on and after November 3, 2021, with no intention by the Defendants to perform the services associated with those invoices and/or the related reversing transactions in which all but a small percentage of the money paid by FSCLE would be paid back to FSCLE. TAC at ¶¶ 10, 23, 89, 118, 120, 121, 159-192 & 216-217; *Taylor v. State*, 450 S.W.3d 528, 536 (Tex. Crim. App. 2014) (holding that theft under the Texas Civil Liability Theft Act may be shown where there is a contract between the victim and the accused if "at the time that money is exchanged pursuant to the contract, the accused either intends not to, or at least knows he will not, perform his part of the bargain."); *AAB Logistics, Inc. v. Forward Air, Inc.*, 2016 WL 8672773, *4 (N.D. Tex. Nov. 18, 2016) (same). This scheme continued after Goodman Networks was internally declared to be defunct with the Defendants sending another 624 invoices to FSCLE after November 23, 2021. TAC at ¶¶ 23-24, 138, 140, 159-217 & 193-215. There is no serious dispute

1

that the funds paid by FSCLE when it received these invoices were owned by FSCLE. Defendant Frinzi even referred to the money held in the 4352 account at Prosperity Bank as "FedEx money", "FedEx trust funds" and the "FedEx account with Prosperity."  TAC at ¶¶ 136 & 143.  Various Defendants and employees of the Defendants affirmatively mislead FSCLE as to the reasons the reversing transactions (payments back to FSCLE) were not happening and they all profited from the schemes to first steal the money and next to launder it. TAC at ¶¶ 120, 130, 144 – 149, 152-158, 222, 289, 374 & 380-409.

For example, in November and December 2021, Defendants James Goodman, Jim Frinzi and Shalom Auerbach met, spoke by phone or texted between Texas and New York discussing the "path forward" which included the plan to take FSCLE's money out of the 4352 account at Prosperity Bank (the account holding the stolen FSCLE money).  TAC at ¶¶ 126, 128 & 300-304. With the exception of some of the individual defendants who knowingly took stolen FSCLE funds,[1] all of the other Defendants, whether corporate entities or persons, are connected with or owned by James Goodman, Frinzi or Shalom Auerbach and were used to launder the stolen funds, used to receive the stolen funds or to perpetrate bankruptcy fraud.[2]  Zakharyayev is an attorney for one or more of the Auerbachs and Pinkhasova is his wife.  TAC at ¶¶ 315, 350 & 352.  Zakharyayev and/or Pinkhasova were the front people allegedly behind the 18920 NW scheme even though in

---

[1] Defendant Jake Goodman was paid $200,000 in "severance" from Goodman Networks but performed no services, the funds paid to him were stolen FSCLE funds and he knew or should have known of the source of those funds.  TAC at ¶¶ 396-404.  Similarly, Defendants Jonathan, Jason and Jody Goodman received payments of stolen FSCLE funds under circumstances that either caused them to know or they should have known of the source of the funds.  TAC at ¶¶ 390-392 and 405-406.

[2] For example, Unified Field Services was utilized to further bankruptcy fraud to conceal the nature of the overall theft of property and laundering of money.  TAC at ¶¶ 435-440.  Auerbach Partners, the Auerbach Trusts and AMRR received stolen FSCLE funds to help launder them. TAC at ¶¶ 299, 321 and 379.

substance the funds were flowing back to James Goodman, Frinzi and/or one or more of the Auerbachs.  TAC at ¶¶ 337-379.  Zakharyayev and Pinkhasova personally profited from their roles in the schemes.  TAC at ¶¶ 374 & 379.

Prosperity Bank played a unique and direct role in the overall enterprise to steal and launder FSCLE's funds.  The point person between Prosperity Bank and James Goodman/Frinzi was Bater Bates, a Prosperity employee.  TAC at ¶ 90.  In October 2021, James Goodman met with Bates and told him of the plan to strip the assets out of Goodman Networks and Genesis.  *Id*.  James Goodman had to enlist Bates and Prosperity Bank in his plan because Prosperity Bank had numerous Goodman Networks and Genesis assets pledged as collateral for loans.  TAC at ¶ 92.

During those discussions about switching collateral to cover existing loans and thus freeing other assets to be stripped out, James Goodman and Bates discussed the 4352 account which housed the FSCLE funds.  *Id*.  Both James Goodman and Bates knew that the 4352 account held FSCLE's money because it was established exclusively to receive FSCLE payments prior to most of that money being sent back to FSCLE in the reversing transactions.  TAC at ¶¶ 7, 80 & 93. Despite knowing that the funds in the 4352 account belonged to FSCLE, Prosperity Bank allowed the 4352 account to be substituted as collateral for loans to allow James Goodman and those working with him to strip the assets out of Goodman Networks and/or Genesis and did so on documents that Bates knew were not validly signed or authorized.  TAC at ¶¶ 109 & 111.

In order to launder the stolen FSCLE funds out of the 4352 account, James Goodman and Frinzi needed Frinzi to obtain control over the 4352 account.  Thus, in October, November and December 2021, James Goodman and Frinzi repeatedly demanded that Prosperity Bank make Frinzi the signor on the 4352 account.  TAC at ¶¶ 103-105, 226-227, 235-236 & 244-245. Prosperity Bank responded to those demands by asking for valid corporate resolutions from

Goodman Networks authorizing Frinzi to be the signor on the 4352 account. TAC at ¶¶ 228-230 & 234. Frinzi first sent Prosperity Bank unsigned documents allegedly authorizing the change in control and later sent falsified documents with signatures. TAC at ¶¶ 226-227 & 245. Prosperity Bank had actual knowledge that it took three directors at Goodman Networks to authorize a change in control of any bank account and that after October 22, 2021, Goodman Networks had only one director. TAC at ¶¶ 82-84 & 98-99. Thus, Prosperity Bank knew that Goodman Networks could not validly authorize a change in control of the 4352 account and yet worked with James Goodman and Frinzi to accomplish that change in control anyway. TAC at ¶¶ 101, 106, 225, 232 & 240-245. Prosperity Bank also knew that Goodman Networks was in winddown. TAC at ¶ 232.

Despite Prosperity Bank's actual knowledge of the lack of authority to change control over the 4352 account and its knowledge of the Goodman Networks winddown, Prosperity Bank gave Frinzi control over the 4352 account. TAC at ¶ 243. Prosperity Bank then allowed Frinzi and those working with him to add outgoing wire capability to the 4352 account. TAC at ¶¶ 132-134. Prosperity Bank even increased the daily limit on the amount of funds being wired out of the account to help facilitate a faster transfer of funds. TAC at ¶ 254. In fact, that decision to increase the daily limit on wire transfers came from the "top of the house" at Prosperity Bank. *Id*. Prosperity Bank further allowed Frinzi and those working with him to use the login credentials of Goodman Networks' employees that Prosperity Bank knew no longer worked for Goodman Networks to make transfers out of the 4352 account. TAC at ¶¶ 250-251. Some of the funds from the 4352 account were used to pay off loans at Prosperity Bank. TAC at ¶ 252. Despite Prosperity Bank claiming that all it did was honor a customer's directions as to where money was sent, the facts as pled in the Third Amended Complaint show that Prosperity Bank was knowledgeable

about the plan being executed by the other Defendants and complicit in it for the benefit of Prosperity Bank.

Defendants John Goodman,[3] Jody Goodman and Jonathan Goodman played a significant role in the schemes set forth in the TAC.  John Goodman owned and controlled Goodman Networks until 2021 when he sold it to James Goodman.  TAC at ¶ 19-20.  During that time, he started the effort to strip assets out of Goodman Networks.  *Id*.  He was a beneficiary of the fraudulent stock sale using stolen FSCLE funds to purchase his worthless stock.  TAC at ¶¶ 26, 374 and 379.  He was part of the effort to help Jim Frinzi obtain control over the 4352 account at Prosperity Bank even though there was no valid corporate authority to do so.  TAC at  ¶ 91 and 101.  John Goodman participated in the money laundering scheme of using stolen FSCLE funds to wash those funds through Multiband Global, AMRR, AMR Resources and ultimately One Path.  TAC at ¶ 278.  He exercised control over Goodman Networks in the fall of 2022 and personally profited with payment of funds that were stolen from FSCLE.  TAC at ¶¶ 292-296, 299, 447, 453-470, 474-478.  He also acted to frustrate the Goodman Networks' bankruptcy in an effort to hide and conceal the various misdeeds done on his behalf and on behalf of his family.  TAC at ¶¶ 433 – 470.

Jody Goodman received stolen FSCLE funds under facts and circumstances where he knew the source of the funds.  TAC at ¶¶ 26, 390-392.   Jody Goodman was a member of the board of Goodman Networks until October 22, 2021 when he resigned and thus would have knowledge of the efforts to strip out the assets of Goodman Networks which began before his resignation.  TAC at ¶ 98.  Despite his resignation from the board, Jody Goodman remained informed and knowledgeable of the efforts of Frinzi and James Goodman including knowledgeable of the

---

[3] Defendant John Goodman has filed a personal bankruptcy.  However, FSCLE sought and obtained an order of relief from the automatic stay permitting it to respond to John Goodman's motion to dismiss.

decision to continue to send invoices to FSCLE with no intent to perform.  TAC at ¶¶ 126-128.  In fact, on November 19, 2021, Jody Goodman sent an email within Goodman Networks saying, "we all agreed this would be for the best" referring to the effort to pull money out of the 4352 account.  TAC at ¶ 135.  After resigning from the Goodman Networks board with full knowledge of the scheme to steal FSCLE's money, Jody Goodman accepted payments from Goodman Networks of stolen FSCLE funds.  TAC at ¶¶ 390-392 and 406.  Finally, without the help of Jody Goodman, John Goodman could not have seized control of Goodman Networks in the fall of 2022 and the engaged in the bankruptcy fraud scheme.  TAC at ¶¶ 435-455.

Jonathan Goodman received stolen FSCLE funds under facts and circumstances where he knew the source of the funds.  TAC at ¶¶ 26, 390-392.  He participated in the laundering of stolen FSCLE funds through Multiband Global, AMRR, AMR Resources and One Path.  TAC at ¶ 278.  Jonathan Goodman helped John Goodman seize control of Goodman Networks in the fall of 2022.  TAC at ¶¶ 453-455.  That effort to put John Goodman in charge of Goodman Networks was aimed at covering up the stolen FSCLE funds that had flowed to the various Goodman brothers including Jonathan.  TAC at ¶¶ 435-455 and 463.  Further, Jonathan Goodman through the MBE Group and his assistance to his brother, John Goodman, acted to defraud the Goodman Networks bankruptcy through knowingly false statements and filings.  TAC at ¶¶ 433 – 470.

Thus, John Goodman, Jody Goodman and Jonathan Goodman were active participants in the schemes at issue in this case.  While the main actors may have been James Goodman, Jim Frinzi and the Auerbachs (and the entities controlled by them), this group of Goodman brothers (much like Prosperity Bank) played key roles.

Having first stolen funds from FSCLE through the use of fraudulent invoices (sent by interstate wire) that Goodman Networks had no intention to perform and then having obtained

control over the 4352 account, James Goodman, Frinzi and Shalom Auerbach then engaged in one or more schemes to launder the stolen FSCLE funds. Those schemes include:

(1) The AMRR-Multiband Scheme (TAC at ¶¶ 256-298) (January 2021 – September 2023) in which $44 million in stolen FSCLE funds were "loaned" by GNET to AMRR. The actual funds came from the 4352 account. Portions of the $44 million in stolen FSCLE funds were used to purchase various businesses and assets which were later sold. The proceeds of these sales went to James Goodman, Frinzi, Shalom Auerbach and entities controlled by them.

(2) The Auerbach/Alliance/Hudson Scheme[4] (TAC at ¶¶ 300-336) (December 2021 – February 2022) in which worthless or near worthless bonds James Goodman held in Goodman Networks were "sold" to Hudson Clean Energy (an entity owned and controlled by the Auerbachs) for $32 million. The funds paid to James Goodman for those bonds were stolen FSCLE funds from the 4352 account. The Auerbachs, Zakharyayev and Pinkasova all received a cut of the stolen funds in exchange for facilitating the fraudulent bond purchase.

(3) The 18920 NW Scheme (TAC at ¶¶ 337-379) (January 2021 – September 2022) in which James Goodman "sold" worthless or near worthless stock in Goodman Networks to 18920 NW, an entity controlled by Zakharyayev and Pinkasova, for $12 million. The funds to pay for the purchase of the stock came from stolen FSCLE funds in the 4352 account. 18920 NW and Zakharyayev were fronts for the Auerbachs. Each took a cut of the "purchase price" to facilitate the transaction. TAC at ¶¶ 374 & 379.

---

[4] Judith Auerbach is sued only in her capacity as Trustee of the Auerbach Childrens' and Auerbach Family Trusts. TAC at ¶ 38. The Trusts received stolen FSCLE funds in exchange for helping launder the funds. TAC at ¶ 289.

(4) Bankruptcy Fraud (TAC at ¶¶ 430 – 478) (August 2022 – January 2023) in which John

Goodman, Jonathan Goodman, Jody Goodman and Frinzi took actions to frustrate the

bankruptcy process to hide their actions or the actions of others like James Goodman

and demanded payments that they were not entitled to obtain.  The source of the

payments during this period were the stolen FSCLE funds originally held in the 4352

account.

One or more of the Defendants attempt to characterize these transactions as ordinary business

transactions.  However, the facts as pled in the Third Amended Complaint show that these

transactions included dueling sets of funds flows memoranda that concealed the true nature of the

transactions.  TAC at ¶ 322.  These were also transactions in which third party brokers refused to

participate.  TAC at ¶¶ 308-312.  Honest businesspersons engaging in ordinary commercial

transactions don't keep two sets of books or shop brokers to find one that will look the other way.

The Defendants worked in an enterprise to steal more than sixty-seven million ($67

million) from FSCLE and then laundered those funds through a series of transactions back to

themselves.  FSCLE has set forth a prima facie claim for each of its causes of action in its TAC

requiring denial of Defendants' motions.

## LAW AND ARGUMENT

**I.     FSCLE More Than Adequately Pled its RICO Claims.**

FSCLE brings claims against the Defendants under 18 U.S.C. § 1962(a)-(d).  To state a

plausible RICO claim, FSCLE alleged facts showing: "(1) a person who engages in (2) a pattern

of racketeering activity, (3) connected to the acquisition, establishment, conduct, or control of an

enterprise" *In re Burzynski,* 989 F.2d 733, 741–42 (5th Cir.1993). A RICO "person" may be "any

individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. §

1961(3);  *St. Paul Mercury Ins. Co. v. Williamson,* 224 F.3d 425, 439 (5th Cir. 2000).

"Racketeering activity" includes certain state and federal offenses enumerated in § 1961(1), including mail or wire fraud. *H.J. Inc. v. Nw. Bell Tell. Co.,* 492 U.S. 229, 239 (1989).  All of these things have been plead in the TAC.

### A.    FSCLE Has Pled a Pattern of Racketeering Activity.

To satisfy the second RICO element a plaintiff must allege a "pattern" of such acts. *In re Burzynski,* 989 F.2d at 742. " 'Racketeering activity' consists of two or more predicate offenses, defined by the statute to include acts violating federal wire or mail fraud statutes." *Word of Faith World Outreach Center Church, Inc. v. Sawyer,* 90 F.3d 118, 122 (5th Cir. 1996) (quoting 18 U.S.C. § 1961). This two-pronged element "requires the plaintiff to plead both that the predicate acts are related to each other and that they either constitute or threaten long-term criminal activity." *In re Burzynski,* 989 F.2d at 742 (quoting *H.J. Inc.,* 492 U.S. at 239). "It is this factor of *continuity plus relationship* which combines to produce a pattern." *H.J. Inc.,* 492 U.S. at 239.

### (1)    Predicate Acts of Theft – 18 U.S.C. § 1961

In its TAC, FSCLE alleges that James Goodman, Frinzi, Shalom Auerbach and the various entities and persons controlled by them first agreed to steal funds from FSCLE by having Goodman Networks send invoices to FSCLE, that it had no intention to perform, and at a time when Goodman Networks was shutting down and was defunct.  TAC at ¶¶ 10, 23, 24, 89, 118, 120, 121, 138, 140, 159, 160-215 & 217.   James Goodman and Frinzi even caused false stories to be presented to FSCLE as to why the reversing transactions (cash back to FSCLE) were not happening.  TAC at ¶¶ 120, 130, 144 – 149, 152 & 157-158.

One or more of the Defendants argue that this fails to constitute a RICO violation or that FSCLE has no standing[5] because, they say, the funds ceased to be FSCLE dollars once transferred

---

[5] These standing arguments were originally made before Bankruptcy Judge Larson in the Goodman Networks chapter 7 bankruptcy.  Defendants argued in that case that FSCLE lacked standing to

to the 4352 account and thus could not be stolen.  This argument fails for several reasons.  First, the RICO theft was the procurement of the funds from FSCLE in the first place.  Payments obtained pursuant to a contractual relationship are considered stolen if the party procuring the payments has no present intention to perform the contract on the day the invoices are sent.  *See Taylor v. State*, 450 S.W.3d 528, 536 (Tex. Crim. App. 2014); and *AAB Logistics, Inc. v. Forward Air, Inc.*, 2016 WL 8672773, *4 (N.D. Tex. Nov. 18, 2016).  Here, FSCLE has pled that the contract between it and Goodman Networks required the reversing transactions by which nearly all of the funds were to be paid back to FSCLE.  TAC at ¶¶ 3-9, 23, 60-64 & 89.  Thus, most of the money paid by FSCLE would go back to FSCLE.   On and after November 3, 2021, Frinzi ordered that no further funds would be paid back to FSCLE while instructing invoices to continue to go to FSCLE to prompt further payments from FSCLE.  TAC at ¶¶ 118-121 & 141.  James Goodman supported this course of theft.  TAC at ¶¶ 123-128.  Thus, the theft occurred when payments were obtained from FSCLE under false pretenses.  The later movement of the cash out of the 4352 account at Prosperity Bank was part of the money laundering – not the original theft.  FSCLE has a unique and particularized injury in this theft as only FSCLE could assert a claim for the theft of its money under these circumstances.  FSCLE thus, has standing to pursue claims related to this theft and to seek remedies for it.

Second, pursuant to Texas law, "[t]he general rule is that when property is stolen, the party who acquires the stolen property does not acquire its title." *Matter of Okedokun*, 968 F.3d 378,

---

assert the claims in this case because those claims allegedly belonged to the bankruptcy estate.   In the context of ruling that FSCLE had not violated the automatic stay, Judge Larson held on March 29, 2024 that the claims asserted by FSCLE in this case belong to FSCLE and are not property of Goodman Networks or its bankruptcy estate.  *In re: Goodman Networks, Inc.,* Case No. 22-31641 (Bkrtcy, N.D. Tex.) [Dkt.# 526, pg. 8 and 9 of 16].   Thus, Defendants standing arguments have already been evaluated and rejected.

390 (5th Cir. 2020) (*citing Matter of Approximately $80,600.00*, 537 S.W.3d 207, 211 (Tex. App.—Houston [1st Dist.] 2017, pet. denied)); *A. Benjamini, Inc. v. Dickson*, 2 S.W.3d 611, 613-614 (Tex. App.—Houston [14th Dist.] 1999, no pet.).  This general rule applies equally to cash that is acquired in an unlawful manner.  *Sinclair Houston Fed. Credit Union v. Hendricks*, 268 S.W.2d 290, 295 (Tex. Civ. App.—Galveston 1954, writ ref'd n.r.e.).  Thus, while FSCLE's cash was possessed or controlled by Goodman Networks in the 4352 account, FSCLE still retained legal or beneficial title to that cash.  Frinzi even referred to the cash in the 4352 account as "FedEx money," "FedEx trust funds" and the 4352 account as the "FedEx account."  TAC at ¶ 136 & 143.

(2)      **Predicate Acts of Mail/Wire Fraud – 18 U.S.C. §§ 1341/1343**

Here the pattern of criminal activity started as the theft using the invoices with no intent to perform the reversing transactions.  Each of those invoices was sent in interstate commerce between Texas, Pennsylvania and/or Tennessee.  TAC at ¶¶ 159-215.  Each invoice thus constituted a separate act of wire and/or mail fraud depending on the mode of transit of each invoice.  FSCLE has specifically pled these acts of mail and wire fraud. Indeed, to properly plead mail/wire fraud, a RICO plaintiff must plead: (1) a scheme to defraud by means of false or fraudulent misrepresentations, (2) the interstate use of mail/wires; (3) use of the mail/wire to carry out the scheme; and (4) actual injury.  *Landry v. Airline Pilots Ass'n Intern. AFL-CIO*, 901 F.2d 404, 428 (5th Cir. 1990); *Bradley v. Phillips Petroleum Co.*, 527 F.Supp.2d 625, 649 (S.D. Tex. 2007) aff'd 332 Fed. App'x 397 (5th Cir. 2009).  The defendant charged with the mail/wire fraud need not have personally sent the article in the mail or via electronic means but rather had to have caused the communication to be sent or knew the use of mail/wires would follow in the ordinary course of business or could reasonably be foreseen.  *United States v. Faulkner*, 584 F.Supp.3d 180, 189 (N.D. Tex. 2022); *D'a Petro., LLC v. Buster*, No. 3:19-cv-02770-M, 2020 U.S. Dist. LEXIS 262937, at *12 (N.D. Tex. Aug. 17, 2020).  Further the actual invoice or communication does not

itself have to be fraudulent; rather the communication must be sufficiently closely related to the fraudulent scheme. *Id*. at 190. Here, the Defendants sent FSCLE dozens of invoices for more than 2,235 transactions worth millions over a period of months all with absolutely no intent to perform those invoices. TAC at ¶¶ 159-215. And they knew or should have foreseen that mail or wires would be used to accomplish the scheme.

      (3)    **Predicate Acts of Bank Fraud – 18 U.S.C. § 1344**

It was not enough to simply steal the funds from FSCLE. Defendants needed to get FSCLE's money out of the 4352 account. To do so, they committed bank fraud colluding with Prosperity Bank to do so. In order to plead bank fraud, a RICO plaintiff must show that a Defendant obtained money, funds, credit, assets, securities or other property owned by or under the custody and control of a financial institution by means of false or fraudulent representations or promises. 28 U.S.C. § 1344; *U.S. v. Saks*, 964 F.2d 1514, 1518 (5th Cir. 1992). Bank fraud may be shown even where the third party colludes with bank officers to achieve the fraud. *Id*. Here, FSCLE has pled that Frinzi and James Goodman worked together with agents of Prosperity Bank to gain access to the 4352 account. TAC at ¶¶ 103-105, 226-227, 235-236 & 244-245. Frinzi and James Goodman presented false corporate documents to Prosperity Bank to accomplish the change in control. TAC at ¶¶ 226-227 & 245. Agents and employees of Prosperity Bank knew the documents presented were false and gave Frinzi control over the 4352 account anyway. TAC at ¶¶ 101, 106, 225, 232 & 240-245. Prosperity Bank even raised the daily limit on the amount of wires that could be sent out. TAC at ¶ 254. Having fraudulently obtained control over the 4352 account, the Defendants moved millions of stolen FSCLE funds out of the 4352 account to fund their money laundering schemes.

(4)    **Predicate Acts of Money Laundering – 18 U.S.C. § 1956**

In order to plead a plausible claim for money laundering, FSCLE must set forth factual allegations showing that one or more of the Defendants: (1) conducted or attempted to conduct a financial transaction; (2) which the defendant knew involved the proceeds of an unlawful activity; (3) with the intent to design the transaction to conceal or disguise the nature, location source or control of the proceeds of the unlawful activity.  *U.S. v. Pendleton*, 761 Fed. Appx. 339, 346 (5th Cir. 2019).  Only one purpose of the transaction needs to be to disguise the source or nature of the funds. *See Regalado Cuellar v. United States,* 553 U.S. 550, 568 (2008).  Thus, while, FSCLE contends the transactions at issue in this case were entirely fraudulent, it does not matter if there was some commercial purpose for the transaction.  If one of the purposes of the transaction was to launder money, liability is established. *Id*.

Here, FSCLE has pled ample allegations of money laundering in several different schemes involving James Goodman, John Goodman, Frinzi, Shalom Auerbach and those persons and entities associated with them including but not limited to Zakharyayev and Pinkhasova.  This includes the AMRR-Multiband Scheme (TAC at ¶¶ 256-298), the Auerbach/Alliance/Hudson Scheme (TAC at ¶¶ 300-336) and the 18920 NW Scheme. TAC at ¶¶ 337-379.  The nature of the efforts to disguise the nature of the transactions and the source of the funds is pled in detail.  For example, Hudson, Auerbach Partners, Neil Auerbach and Shalom Auerbach kept two sets of fund flows in at least one of these transactions with one showing the funds flowing back to James Goodman and another that showed only the partial flow of funds between Alliance and James Goodman's entities, which was formalized into a Funds Flow Memorandum and fraudulently concealed Goodman Networks and the 4352 Account as the source of funds for the bond purchase. TAC at ¶ 322.  The Auerbachs had Zakharyayev and 18920 NW be the nominal "purchaser" of bonds even though it was really the Auerbachs using stolen FSCLE funds.  TAC at ¶ 357-358.

James Goodman texted Frinzi on March 1, 2022 saying, "Steven [Zakharyayev] is trying to get me sell at $3.00 . . . tell him $3.50.  **He will get his money back and then some** . . ."  TAC at ¶ 360(emphasis added).  As further evidence that the transactions were designed to hide the true nature of the transactions, Frinzi also texted James Goodman saying, "I have a plan to get most money back to you, **without exposing you are the beneficiary** . . ." TAC at ¶ 348 (emphasis added).

In each of these schemes, the source of the funds for the deals was FSCLE's money in the 4352 account.  TAC at ¶¶ 268, 290, 296, 330 & 357.  In each case, the participants in the transactions knew the source of the funds for the transactions came from FSCLE.  TAC at ¶¶ 272, 285, 291, 299, 329, 335-336, 367, 372 & 374.  And, in each case, the transactions resulted in the funds flowing back to one or more of the Defendants including James Goodman, John Goodman, Jason Goodman, Jonathan Goodman, Jody Goodman, Frinzi, Neil Auerbach, Shalom Auerbach, Steven Zakharyayev, Evalina Pinkasova and the entities controlled by them.  TAC at ¶¶ 278, 280-283, 289, 295, 299, 374 & 379.

(5)    **Predicate Acts of Sending/Receiving Stolen Funds – 18 U.S.C. §§ 2314/2315**

To set forth a plausible claim of sending and receiving stolen money, a RICO plaintiff must set forth facts showing:  (1) defendants sent or received stolen money in interstate commerce, (2) defendants knew money was stolen, and (3) the value of goods or money exceeded $5,000.  *U.S. v. Anderson*, 174 F.3d 515, 522 (5th Cir. 1999); *U.S. v. Hanafy*, 124 F.Supp.2d 1016, 1019 (N.D. Tex. 2000).  Here, FSCLE pleads that its stolen funds went from either Pennsylvania or Tennessee to Texas.  TAC at ¶ 6 and 579.  Those stolen funds were also moved to accounts in California, Rhode Island, North Carolina, New York, Georgia and/or Florida before going back to Texas.  TAC at ¶¶ 274, 472, 583 & 585.  The individuals who received those funds, including Jake Goodman, knew them to have originated with FSCLE.  TAC at ¶¶ 272, 285, 291, 299, 329, 335-

336, 367, 372, 374,  381-385, 391-392, 394, 404-404 & 409.  The amounts at issue all significantly exceeded $5,000.  For example, Jake Goodman was paid $200,000.  TAC at ¶ 403.

Predicate acts are related where the acts "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and not isolated events." *Word of Faith,* 90 F.3d at 122. All of these predicate acts are connected in their overall purpose:  getting stolen FSCLE funds to the Defendants.  They started with the theft of the FSCLE funds. Then they moved to bank fraud to fraudulently gain control of the 4352 account and to money laundering and sending and receiving stolen property.

### (6)  **Predicate Acts of Bankruptcy Fraud – 18 U.S.C. § 152**

To state a plausible RICO predicate act of bankruptcy fraud (concealment of assets, false oaths and claims), FSCLE alleged facts showing: "(1) the Defendants engaged in a course of action with specific intent to defraud, (2) engaging in a scheme to defraud a bankruptcy proceeding, and (3) the filing of a bankruptcy petition or other related documents or a false statement or fraudulent representation during a bankruptcy proceeding to conceal or execute the scheme.  *U.S. v. Chaker*, 820 F.3d 204, 210 (5th Cir. 2016); and *U.S. v. Spurlin*, 664 F.3d 954, 964 (5th Cir. 2011).

Here, John Goodman caused Frinzi to resign as the CEO of Goodman Networks in the summer of 2022.  TAC at ¶ 442.  At that point, Goodman Networks had either no director or one director, James Goodman, no CEO and could not take any valid corporate action.  TAC at ¶¶ 444 and 453.  Thereafter, John Goodman directed that the then resigned Frinzi sign documents on behalf of Goodman Networks that John Goodman knew could not be validly signed.  TAC at ¶ 445-446.  Despite the fact that Frinzi had resigned effective immediately in May 2022, John Goodman asked Frinzi to sign a resignation letter with an effective date of September 4, 2022 to paper over the documents signed in between the actual resignation and the false date of the written resignation.  TAC at ¶ 447.  John Goodman then had Goodman Networks execute a series of stock

conversion that personally benefitted him.  TAC at ¶¶ 448-452.  John Goodman then caused knowingly false and fraudulent bankruptcy schedules and statement of financial affairs to be filed in the Goodman Networks bankruptcy to conceal the stock conversion and the fraudulent Frinzi consent.  TAC at ¶ 451.

In September 2022, James Goodman, John Goodman, Jonathan Goodman, Jason Goodman and Jody Goodman, acting as the MBE Group (one of the shareholders of Goodman Networks), worked together to establish John Goodman's control over Goodman Networks through an alleged consulting agreement.  TAC at ¶¶ 454-457.  The consulting agreement was fraudulent, void, and entered into to allow John Goodman, under purported color of authority, to conceal property of the estate, to falsify books, records and documents of Goodman Networks, and to frustrate FSCLE's and the other creditors' attempts to have a trustee administer the property of Goodman Networks.  TAC at ¶ 458.  John Goodman could not have seized control of Goodman Networks without the assistance of Jonathan Goodman and Jody Goodman.  TAC at ¶ 454.  Having seized control of Goodman Networks, John Goodman then caused Goodman Networks to enter into a series of transactions to personally benefit himself.  TAC at ¶¶ 471-478.

On October 31, 2022, John Goodman and the Goodman MBE Group (including Jonathan Goodman and Jody Goodman) caused Goodman Networks to file in the Bankruptcy Court an Objection to FSCLE's joinder to the involuntary bankruptcy petition and made the knowingly false statement that "FSCLE is not a creditor – in any form – of Goodman."  TAC at ¶ 459.  John Goodman, Jonathan Goodman and Jody Goodman made this false statement with knowledge that the Goodmans and Frinzi had caused Goodman Networks to steal/defraud at least $67 million from FSCLE.  TAC at ¶ 459.  This group of Goodman brothers took numerous actions to hide their dealings from the bankruptcy process, the hide assets from the bankruptcy court and sought to

convert the chapter 7 bankruptcy into a chapter 11 bankruptcy to allow them to remain in control of Goodman Networks to conceal what had happened.  TAC at ¶¶ 460-470.

These facts, backed by the discovery and pleadings in the related Goodman Networks bankruptcy, establish a prima facie case of bankruptcy fraud.  The purpose of seizing control of Goodman Networks in the fall of 2022 and then filing the false and fraudulent documents in the bankruptcy was both to direct stolen assets to themselves and also to further hide what their family members and other co-conspirators had done.  FSCLE has set forth an additional predicate act of bankruptcy fraud.[6]

(7)    **FSCLE Has Pled Sufficient Continuity.**

For a series of related predicate acts to constitute a RICO "pattern of activity," a RICO plaintiff must also allege that the conduct was sufficiently continuous. "It is 'continuity' that assures a federal cause of action." *In re Burzynski,* 989 F.2d at 742. Continuity may be alleged as "either a closed period of repeated conduct, or an open-ended period of conduct that, 'by its nature projects into the future with a threat of repetition.' " *Word of Faith,* 90 F.3d at 122 (quoting *H.J. Inc.,* 492 U.S. at 240). A closed period of conduct may be properly pleaded by alleging "a series of related predicates extending over a substantial period of time." *Id.* (citing *H.J. Inc.,* 492 U.S. at 241). An open period of conduct requires allegations of "a specific threat of repetition extending indefinitely into the future," or that "the predicates are a regular way of conducting defendant's ongoing legitimate business." *Id.*

---

[6] In a few sentences, these Defendants make the conclusory assertion that the Court will lack jurisdiction if the RICO claims are dismissed. Of course, this assumes a decision that has not been made. Further, FSCLE disputes this assertion. If the Court determines that all of its RICO claims must be dismissed at this early pleading stage, FSCLE requests the opportunity to then fully brief the jurisdictional argument made by these Defendants. At this time, such briefing seems premature and unnecessary.

Here, FSCLE has pled specific facts of both an open-ended threat and a closed period that lasted nearly two years. The open-ended threat is pled as the continuing effort to further launder the stolen FSCLE funds. TAC at ¶ 28. Whether an open-ended pattern of continuity has been sufficiently pled turns on whether the predicate acts themselves pose a "*threat* of continuity." *H.J., Inc.,* 492 *U.S.* at 241. An open-ended pattern exists when the predicates "involve a distinct threat of long-term racketeering activity, either implicit or explicit." *Id.* at 242. As can be seen by the various money laundering schemes, the Defendants did not just flip the money once through one transaction. Rather, as in the example of the AMRR scheme, it involved further downstream transactions and business units being sold, resold and rebranded. TAC at ¶¶ 285, 287 & 292-299. That effort to launder the money and the business units themselves shows no end and continues as a threat. If FSCLE were to get close to recovering from one of the businesses, Defendants' conduct reflects they could, and likely would, wash the assets through further transactions.

Even if these predicate acts could be seen as a closed-ended threat, the length of the threat is sufficient to satisfy pleading requirements. The Fifth Circuit has "presumed that more than a year of racketeering acts constitute a 'substantial period of time'" sufficient to show RICO continuity. *D&T Partners, L.L.C. v. Baymark Partners Mgmt., L.L.C.,* 98 F.4th 198, 206 (5th Cir. 2024). Here, the pattern of racketeering behavior affecting FSCLE began no later than November 3, 2021 when Frinzi instructed employees of Goodman Networks to stop all further payments to FSCLE while still sending FSCLE fraudulent invoices. TAC at ¶10, 23 & 118. The AMRR/Multiband scheme lasted at least through September 2023. TAC at ¶¶ 279 & 298. That means even if the pattern was closed-ended, it lasted at least 23 months.

The Fifth Circuit recently reminded that "[b]ecause continuity depends on the specific facts of each situation, no one test can be fixed 'in advance with such clarity that it will always be

18

apparent whether in a particular case a 'pattern of racketeering activity' exists.'" *D&T Partners,* 98 F.4th at 206 (quoting *H.J. Inc.,* 492 U.S. at 243). Thus, closed-ended continuity lasting twenty to twenty-four months has been found by the Fifth Circuit and district courts in Texas to be sufficiently long to satisfy RICO pleading standards. *See U.S. v. Thompson*, 2001 WL 498430, at *9 (5th Cir. Apr. 9, 2001)(twenty to twenty-one month period of continuity sufficient); *Abraham* v. *Singh*, 480 F.3d. 351, 356 (5th Cir. 2007) (twenty-four months sufficient); *Cypress/Spanish Ft. 1, L.P. v. Pro Serv. Indus., Inc.*, 814 F.Supp.2d 698, 714 (N.D. Tex. 2011)(approximately twenty-four months sufficient); *United Healthcare Servs., Inc. v. Next Health, LLC*, 2021 WL 764035 at *11 (N.D. Tex. Feb. 26, 2021) (twenty-four months sufficient); *DHI Group, Inc. v. Kent*, 397 F. Supp. 3d 904, 926 (S.D. Tex. 2019)(twenty-two months sufficient); and *Hewlett-Packard Co. v. Byd:Sign, Inc.*, 2007 WL 275476, at *5 (E.D. Tex. Jan. 25, 2007)(twenty-two months sufficient).

Other jurisdictions have found continuity at even shorter periods of time. See *First Nat'l Bank & Trust Co. v. Hollingsworth*, 931 F.2d 1295, 1304 (8th Cir. 1991)(fifteen months sufficient); *United States v. Hively*, 437 F.3d 752, 762 (8th Cir. 2006)(only twelve months required); *Resol. Trust Corp. v. Stone*, 998 F.2d 1534, 1543 (10th Cir. 1993)(eighteen months sufficient); and *Liquid Air Corp. v. Rogers,* 834 F.2d 1297, 1304 (7th Cir. 1987)(seven months sufficient). The twenty-three month period of continuity pled by FSCLE satisfies the continuity requirement.

A number of the Defendants cite to and rely upon *D&T Partners*, 98 F.4th 198 (5th Cir. 2024) as alleged support for their arguments while glossing over the unhelpful portions of *D&T.* Regardless, Defendants' outsized reliance on *D&T* is misplaced. The Fifth Circuit in *D&T* noted that RICO cases are highly fact specific when it observed that "no one test can be fixed in advance with such clarity that it will always be apparent whether in a particular case a pattern of

racketeering activity exists." *Id.* at 206.   When discussing continuity, the *D&T* court referenced the absence of multiple targeted victims as relevant as well as whether the racketeering conduct involved different schemes at different points in time. *Id*. at 206-207.   "This is because the idea of 'continuity' embraces 'predicate acts occurring at different points in time **or** involving different victims.'"  *Id*. (emphasis added).  But, "[i]f numerous schemes are alleged, such allegations are 'highly relevant' to the continuity inquiry and tend to support such a finding."  *Id.* at 207 (citing to *H.J. Inc.*, 492 U.S. at 240).  Thus, the continuity analysis is fact specific and multi-factor that looks at, among other things, the length of time, the number of victims and the number of schemes.

In *D&T*, the Fifth Circuit found that continuity had not been established where the scheme lasted four years because there was only one victim and one scheme.  *Id*. at 208.  This stands in contrast to many other RICO cases where RICO claims involving a single victim have been allowed to proceed.  *See, e.g..*, *Cosmos Forms Ltd. v. Guardian Life Ins. Co. of Am.*, 113 F.3d 308, 309 (2d Cir. 1997)(one victim, multiple schemes); *Liquid Air Corp.,* 834 F.2d at 1304 (one victim, multiple acts); *Uniroyal Goodrich Tire Co. v. Mut. Trading Corp.*, 63 F.3d 516, 524 (7th Cir. 1995)(one victim, multiple schemes); *Cypress/Spanis,* 814 F. Supp. 2d at 714 (one victim, multiple schemes); *Com. Metals Co. v. Chazanow,* 2009 WL 3853704, at *7 (N.D. Tex. Nov. 17, 2009)(one victim, multiple schemes); *Hewlett-Packard Co. v. Byd:Sign, Inc.*, 2007 WL 275476 at *5 (E.D. Tex. Jan. 25, 2007)(one victim, multiple schemes).  Thus, the existence of a single victim is not determinative.  *D&T* simply does not stand for the proposition that no RICO claim could be made by a single victim. That was only part of the Fifth Circuit's analysis tempered by its introductory remark that the court has "been skeptical of RICO allegations when the victims of the alleged racketeering conduct are limited." *D&T Partners,* 98 F.4th 206.

Unlike the facts of *D&T*, the facts here show multiple schemes.  The first scheme involved the use of the fraudulent invoices to steal FSCLE's funds and the lies to cover up the theft.  The second scheme involved the effort to fraudulently obtain control over the 4352 account.  Then, there were at least three distinct schemes to launder the stolen funds through various money laundering transactions, including the AMRR/Multiband Scheme, the Hudson/Auerbach Scheme and the 18920 NW Scheme.  In *D&T* the sole purpose of the scheme was the transfer of funds from one company to another but here the stolen FSCLE funds ultimately went to a myriad of persons and companies including those who facilitated the money laundering.  Unlike in *D&T*, the injury to FSCLE is not derivative[7] of injury to another person or entity.

Here, FSCLE has pled a period of continuity[8] that has been consistently held by courts in this Circuit and others to be sufficient to satisfy RICO.  FSCLE has also pled multiple schemes involving injury of more than $67 million to FSCLE.  This is a sufficiently pled pattern of RICO activity.

### B.    FSCLE Has Pled the Existence of An Enterprise.

In addition to pleading a pattern of RICO activity, FSCLE hast plead the existence of an "enterprise."  *See In re Burzynski,* 989 F.2d at 741–42. "Congress gave the term 'enterprise' a very broad meaning." *United States v. Elliott,* 571 F.2d 880, 897 (5th Cir.1978) (quoting *United States v. Hawes* 529 F.2d 472, 479 (5th Cir.1976)).  Under the statute, "'enterprise' includes any

---

[7] Bankruptcy Judge Michelle Larson held on March 29, 2024 that the claims asserted by FSCLE in this case belong to FSCLE and are not property of Goodman Networks or its bankruptcy estate. *In re: Goodman Networks, Inc.,* Case No. 22-31641 (Bkrtcy, N.D. Tex.) [Dkt.# 526, pg. 8 and 9 of 16].  Therefore, FSCLE's claims are not derivative.  They are direct claims.

[8] FSCLE's pled period of continuity is at least twenty-three months.  FSCLE pled this period of continuity based on the documents and information available to it without the benefit of discovery.  FSCLE suspects that the actual period will wind up being much longer because the facts of the dispute between non-party, Arris and many of the same Defendants look very familiar to the pattern of activity in this case.  Moreover, Defendants actions with AT&T may also show a longer period.  Only discovery will illuminate the full length of the RICO enterprise.

individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). A "RICO enterprise can be either a legal entity or an association-in-fact." *St. Paul Mercury Ins. Co.,* 224 F.3d at 440. "If the alleged enterprise is an association-in-fact, the plaintiff must show evidence of an ongoing organization, formal or informal, that functions as a continuing unit over time through a hierarchical or consensual decision-making structure." *Id.* When an association-in-fact is asserted, the plaintiff must also show that the association-in-fact exists for purposes other than simply to commit the predicate acts. *Elliott v. Foufas,* 867 F.2d 877, 881 (5th Cir.1989).

RICO does not require that an enterprise be a separate business-like entity. *Allstate Ins. Co. v. Michael Kent Plambeck, D.C.*, 2014 WL 1303000, at *3 (N.D. Tex. Mar. 31, 2014) (citing *Boyle v. United States*, 556 U.S. 938, 945 (2009)). An association-in-fact enterprise is simply a continuing unit that functions with a common purpose and course of conduct. *Boyle*, 556 U.S. at 950. Although each member of the enterprise must also share this common purpose, *Michael Kent Plambeck*, 2014 WL 1303000, at *3, the enterprise concept is broad. *Boyle*, 556 U.S. at 949. An association need not have a "hierarchical structure," a "chain of command," or any formalized procedures. *Id.* at 948. Decisions may be made on an ad hoc basis and members need not have fixed roles. *Id.* Thus, alleging that association-in-fact members actively associate with one another and work cooperatively and illegally to achieve a goal is sufficient to establish plausible enterprise status. *Adhikari v. Daoud & Partners*, 697 F.Supp.2d 674, 692 (S.D.Tex.2009). Interdependent and coordinated associations that exist to perpetuate the enterprise and its profitability likewise satisfy the common-purpose structural element. *Michael Kent Plambeck*, 2014 WL 1303000, at *3; *see also United States v. Elliott*, 571 F.2d 880, 898 (5th Cir.1978) (noting that a shared "desire to make money" is sufficient to satisfy RICO's common-purpose requirement). Although a

defendant may not be both a person and an enterprise, a defendant may be both a person and a part of an enterprise. *St. Paul*, 224 F.3d at 447.

Here, FSCLE has pled an association in fact enterprise with James Goodman, Frinzi, Shalom Auerbach and John Goodman at the top.  James Goodman and Frinzi made the decision to stop payments to FSCLE but continued to send fraudulent invoices while directing Goodman Networks' employees to lie to FSCLE about why the reversing transactions were not happening. TAC at ¶¶ 10, 23 & 118.  Frinzi and James Goodman communicated and coordinated about the plan to then move FSCLE's money out of the 4352 account and to them.  TAC at ¶¶ 301-304. Frinzi and Shalom Auerbach spoke by phone and texts no later than December 9, 2021 about the "path forward" to get as much cash out of Goodman Networks as possible.  TAC at ¶ 300.  Frinzi, James Goodman and Shalom Auerbach worked together to coordinate the fraudulent bond sale. TAC at ¶ 307.  Frinzi and James Goodman coordinated on the fraudulent effort to obtain control of the 4352 account.  TAC at ¶¶ 223-255.  Auerbach was so involved in the planning and coordination of the enterprise that he caused two versions of a funds flow memo to be created. TAC at ¶ 322.  Auerbach directed that the fraudulent scheme to buy James Goodman's worthless stock in Goodman Networks (using FSCLE's funds) occur in the name of Zakharyayev, Pinkasova and/or their entity 18920 NW, LLC.  TAC at ¶ 358.  John Goodman began to exert control and direction over the association in fact in May 2022 when he took efforts to retake control of Goodman Networks.  TAC at ¶ 442.  John Goodman with James Goodman directed that Frinzi resign as CEO of Goodman Networks.  TAC at ¶ 447.  This allowed John Goodman to then direct that fraudulent bankruptcy schedules and statements be filed to conceal certain transactions that benefited him. TAC at ¶ 451.  John Goodman further directed that Goodman Networks file false

documents in the bankruptcy case to deny any liability to FSCLE knowing that at least $67 million in FSCLE funds were stolen and laundered to his brother and others.  TAC at ¶ 459.

This association in fact did not exist solely to carry out the RICO enterprise.  John Goodman had been the owner and controlling shareholder of Goodman Networks and James Goodman's brother.  TAC at ¶ 73.  James Goodman controlled Goodman Networks for a significant period of time.  TAC at ¶ 77.  Jason Goodman, Jody Goodman and James Goodman were, at various times, members of the board of Goodman Networks.  TAC at ¶ 98.  Frinzi served as the CEO of Goodman Networks and AMRR.  TAC at ¶¶ 264-265.  Shalom Auerbach served on the board of AMRR with Frinzi.  TAC at ¶ 266.  Zakharyayev was an attorney for the Auerbachs.  TAC at ¶¶ 315 and 350.  Thus, there was a connection between the various members of the enterprise separate and apart from the purpose of the enterprise itself.   FSCLE has set forth an enterprise for purposes of evaluating a RICO complaint at the motion to dismiss stage.

### C.      Joint and Several Liability of the Members of the Enterprise.

All who participate in a RICO enterprise are liable for all of the damage caused by the enterprise.  *Reves v. Ernst & Young*, 507 U.S. 170, 184 (1993).  That includes "lower rung participants in the enterprise who are under the direction of upper management."  *Id*.  "Every circuit in the country that has addressed the issue has concluded that the nature of both the civil and criminal RICO offenses requires imposition of joint and several liability because all defendants participate in the enterprise responsible for the RICO violations."  *Cartwright v. Ghattas*, 2010 WL 11506415 at *4 n.6 (W.D. Tex. March 16, 2010)(citing *U.S. v. Phillip Morris USA*, 316 F.Supp.2d 19, 27 (D.D.C. 2004)(collecting cases)). Thus, each of the Defendants in this case faces liability for the whole of the damage caused and not just their particular part in the enterprise.

II.    **FSCLE Adequately Pled its Claims Under the Texas Theft Liability Act and Common Law Theft.**

Most of the Defendants make the erroneous argument that there can be no claim under the Texas Theft Liability Act or common law for theft when the payments from FSCLE were made pursuant to the contract between FSCLE and Goodman Networks. As set forth in *Taylor v. State*, 450 S.W.3d 528, 536 (Tex. Crim. App. 2014) and *AAB Logistics, Inc. v. Forward Air, Inc.*, 2016 WL 8672773, *4 (N.D. Tex. Nov. 18, 2016), one is liable for theft even where there is a contract if, at the time the contractual payment is sought from the other contracting party, the party seeking payment has no intent to perform the contract. That is exactly what FSCLE pled in this case. Goodman Networks stopped any intent to perform but continued to send invoices to FSCLE for the express purpose of taking funds from FSCLE. TAC at ¶¶ 10, 23, 24, 89, 118, 120, 121, 138, 140, 159, 160-215 & 217. James Goodman and Frinzi even caused false stories to be presented to FSCLE as to why the reversing transactions (cash back to FSCLE) were not happening. TAC at ¶¶ 120, 130, 144 – 149, 152 & 157-158. They continued this course of conduct even when employees at Goodman Networks asked for permission to perform the contract and send payments back to FSCLE and expressed discomfort in the direction from Frinzi and James Goodman. TAC at ¶¶ 125 & 129. This is classic theft by contract as set forth in *Taylor* and *AAB Logistics*.

Further, FSCLE has pled that it and Goodman Networks agreed that all but .02% of the funds paid by FSCLE to Goodman Networks would flow back to FSCLE. TAC at ¶¶ 4-6. In fact, that is exactly what happened month after month until November 2021 when Frinzi, James Goodman and others acted to interrupt the automated process of funds flow to steal the funds from FSCLE. TAC at ¶¶ 9-10. Defendant Frinzi even referred to the money held in the 4352 account at Prosperity Bank as "FedEx money", "FedEx trust funds" and the "FedEx account with Prosperity." TAC at ¶¶ 136 & 143. Thus, under *Taylor Pipleine Const., Inc. v. Directional Rd.*

*Boring, Inc.*, 438 F.Supp.2d 696, 707 (E.D. Tex. 2006), the taking of the FSCLE funds held in the 4352 account also constitutes theft because the FSCLE funds were segregated and by agreement and practice all but .02% of the funds held in that account belonged to and were routinely paid back to FSCLE.

Importantly, FSCLE was not required to plead that each defendant directly stole FSCLE's funds. Rather, any party who received stolen property is liable for the original theft even if the theft was performed by another if they knew that the property was stolen. *See* TEX. PENAL CODE § 31.03(b)(1); *Compass Bank v. Villarreal*, 2011 WL 1740270, at *14 (S.D. Tex. May 5, 2011). Thus, arguments that various Goodman brothers and children did not directly steal the FSCLE funds but later received them fall flat. FSCLE has pled in each case that the Goodman family members knew the funds they received were stolen FSCLE funds. See e.g. TAC at ¶¶ 404 (Jake Goodman knew the funds he received were stolen) & 409. Similarly, the Auerbachs knew the original source of the funds came from fraud/theft. TAC at ¶¶ 329-336. Additionally, Prosperity Bank received some of the stolen FSCLE funds and knew the source of those funds. TAC at ¶¶ 225-233 & 252-254.

## III.     FSCLE Adequately Pled its Unjust Enrichment Claim.

Unjust enrichment encompasses a number of equitable doctrines designed to prevent a party from retaining benefits conferred by another without compensation. *Compass Bank*, 2011 WL 1740270 at *10. When one party has been unjustly enriched by receiving money that in equity and good conscience belongs to another, the latter may bring an unjust enrichment claim[9] for

---

[9] While there exists a contract between FSCLE and Goodman Networks that FSCLE contends requires the reversing transactions to occur, various Defendants have disputed that the contract requires a reversing transaction. Where there is a dispute as to what the contract does or does not require, an unjust enrichment claim may be pled in the alternative. *TIB--The Indep. BankersBank v. Canyon Cmty. Bank*, 13 F. Supp. 3d 661, 672 (N.D. Tex. 2014).

"money had and received." *See Staats v. Miller,* 150 Tex. 581, 243 S.W.2d 686, 687–88 (Tex.1951); *Amoco Prod. Co. v. Smith,* 946 S.W.2d 162, 164 (Tex. App.—El Paso, 1997, no writ) ("A cause of action for money had and received belongs conceptually to the doctrine of unjust enrichment."); *Burlington Northern R.R. Co. v. Southwestern Elec. Power Co.,* 925 S.W.2d 92, 101 n. 5 (Tex. App.—Texarkana 1996, no writ). To recover, the plaintiff need only show that the defendant holds money which in equity and good conscience belongs to the plaintiff. *Staats,* 243 S.W.2d at 687–88; *see Doss v. Homecoming Financial Network, Inc.,* 210 S.W.3d 706, 711 (Tex. App.—Corpus Christi 2006, pet. denied) ("A cause of action for money had and received is not based on wrongdoing, but, instead, 'looks only to the justice of the case and inquires whether the defendant has received money which rightfully belongs to another.'" (quoting *Amoco Prod.,* 946 S.W.2d at 164)); *Hunt v. Baldwin,* 68 S.W.3d 117, 132 (Tex. App.—Houston [14th Dist.] 2001, no pet.) (same).  Here, FSCLE has pled more than sufficient factual allegations to support its unjust enrichment claim against all Defendants.

## IV.    FSCLE Adequately Pled its Fraud Claims.

To set forth a valid claim for fraud, a plaintiff show: (1) that a material misrepresentation was made, (2) the representation was false, (3) when the representation was made, the speaker knew it was false, (4) intent to cause the other party to act upon the representation, (5) reasonable reliance and (6) damages.  FSCLE has pled each of these elements.  Among the material misrepresentations were the invoices sent to FSCLE on and after November 3, 2021 when Goodman Networks no longer had any intent to perform.  TAC at ¶¶ 10, 23, 89, 118, 120, 121, 159, 160-192 & 217.  Each invoice came with the representation that the reversing transaction sending all but .02% of the funds back to FSCLE would occur.  TAC at ¶¶ 715-717. The misrepresentations continued even after Goodman Networks declared that it was defunct.  TAC at ¶¶  24, 138, 140, 159, 217, 193-215 & 718-722.  Various Defendants and employees of the

Defendants affirmatively mislead FSCLE as to the reasons the reversing transactions (payments back to FSCLE) were not happening. TAC at ¶¶ 120, 130, 144 – 149, 152 & 157-158. The false explanations given to FSCLE seemed reasonable because there had been a previous delay in the reversing transactions that was corrected. TAC at ¶¶ 725-726. The sending of fraudulent invoices has been found to constitute actionable fraud. See e.g. *Wells Fargo Bank, N.A. v. Sutherland*, 2017 WL 7052266, at *2 (W.D. Tex. Nov. 28, 2017).

Those who receive the benefits of fraud are liable even if they did not themselves commit the fraud if they know that the source of the funds received came from fraud. See *Teachers Credit Union v. Hernandez*, 814 S.W.2d 195, 198-99 (Tex. App. –San Antonio 1991, no writ). FSCLE has pled in each case that the various Goodman family member knew that the funds received by them were stolen FSCLE funds. *See e.g.* TAC at ¶¶ 404 (Jake Goodman knew the funds he received were stolen) and 409. Similarly, the Auerbachs knew the original source of the funds came from fraud/theft. TAC at ¶¶ 329-336. Additionally, Prosperity Bank received some of the stolen FSCLE funds and knew the source of those funds. TAC at ¶¶ 225-233 & 252-254.

## V.    FSCLE Adequately Pled its Tortious Interference Claim.

To properly plead a claim for tortious interference, a plaintiff must show: (1) the existence of an enforceable contract subject to interference, (2) the defendant willfully and intentionally interfered with the contract; (3) that the interference caused the injury, and (4) actual injury. *Cmty. Health Sys. Pro. Sers. Corp. v. Hansen*, 525 S.W. 3d 671, 689 (Tex. 2017). FSCLE has pled each of these elements. The enforceable contract is the master services agreement and the agreement to send the reversing payments back to FSCLE. TAC at ¶¶ 734-744. Frinzi, James Goodman and Prosperity Bank were all aware of the master services agreement including specific discussions with Prosperity Bank and the history of payment into the 4352 account and the way the 4352 account was originally established. TAC at ¶¶ 738-744. James Goodman and Frinzi willfully and

28

intentionally caused the reversing transactions to stop while continuing to invoice FSCLE with no intent to have Goodman Networks perform the transactions.  TAC at ¶¶ 745-750.

Frinzi and James Goodman argue that they cannot, as a matter of law, interfere with the contract between FSCLE and Goodman Networks because they were employees or agents of Goodman Networks.  Employees or agents may be liable for interference with the contract of their employer/principal and a third party if the employee/agent acted "in a fashion contrary to the corporation's best interests that his actions could only have been motivated by personal interests." *Holloway v. Skinner*, 898 S.W.2d 793, 796 (Tex. 1995).  Of course, that is exactly what FSCLE pled.  Frinzi and James Goodman engaged in the fraudulent invoice scheme to steal money from FSCLE not to benefit Goodman Networks but to establish a pot of money that they could then launder for their own benefit.  TAC at ¶¶ 118-122, 221-222.  Moreover, Frinzi and James Goodman engaged in this scheme even after employees of Goodman Networks expressed discomfort with continuing to invoice FSCLE with no reversing transactions occurring (TAC at ¶ 129-131) and after Goodman Networks was internally declared defunct.  TAC at ¶¶ 138, 141-144.

Prosperity Bank interfered with the master services agreement by granting Frinzi control over the accounts even though Prosperity Bank knew there was no valid corporate resolution authorizing the change in control and when it knew of the plan to strip the assets out of Goodman Networks through the conversations between Frinzi, James Goodman and Bater Bates and then allowed the raid on the 4352 account.  TAC at ¶¶ 742, 753-759.

Had either Frinzi or James Goodman not interfered with the reversing transactions or had Prosperity Bank not interfered with control of the 4352 account, the funds would have been there to pay FSCLE.  TAC at ¶¶ 759.  FSCLE suffered damages in the tens of millions for these acts. TAC at ¶ 760.

## VI.    FSCLE Adequately Pled its Conspiracy Claim.

FSCLE pleads both a RICO conspiracy and a common law conspiracy.  In order to establish a plausible claim for conspiracy, FSCLE must show: (1) two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action to be accomplished, (4) one or more overt acts in furtherance of the conspiracy, and (5) damages.  *Agar Corp Inc. v. Electro Cirs. Int'l, LLC*, 580 S.W.3d 136, 141 (Tex. 2019).  FSCLE has met each of these elements with detailed pleading found at TAC ¶¶ 635-650.  The initial group of co-conspirators included Frinzi, James Goodman, John Goodman, Jason Goodman, Jody Goodman, and Jonathan Goodman.  TAC at ¶ 635.  The purpose of the initial conspiracy was to strip assets out of the Goodman controlled entities including Goodman Networks prior to those companies going bankrupt.  *Id*.  The agreement for the original conspiracy is seen in the October 12-13 emails.  TAC at ¶ 637.  The acts taken in furtherance of the conspiracy can be found at TAC ¶ 638.

The initial conspiracy then grew to include Prosperity Bank, the Auerbachs, Zakharyayev, Pinkhasova and the entities controlled by them.  TAC at ¶ 636.  The expanded purpose of the conspiracy was the launder the stolen FSCLE funds.  *Id*. Auerbach's agreement to join the conspiracy is pled as his communications with Frinzi in early December 2021 and his decision to move forward with the laundering transactions even though he was warned of the nature of the transactions by an independent broker.  TAC at ¶¶ 639-640.  Neil Auerbach's agreement to join the conspiracy can be seen in his approval of one or more of the deals through deals involving two sets of funds flows that he expressly approved.  TAC at ¶ 642.  Prosperity Bank's agreement can be seen in Bater Bates accepting the fraudulent Goodman Network documents giving Frinzi control of the 4352 account even through Bates knew the documents to be fraudulent.  TAC at ¶ 638(d).   The list of overt acts committed by each of the co-conspirators can be found at TAC ¶¶

30

639 & 644.  FSCLE was damaged as a result of this conspiracy and the acts taken to further it. TAC at ¶ 648.

## VII.    The Economic Loss Doctrine Is No Bar to FSCLE's Claims.

Some[10] of the Defendants argue that the economic loss doctrine acts as a bar to FSCLE's state tort claims citing to *Suissi v. Wells Fargo Bank Nat'l Ass'n as Tr. For Soundview Home Loan Tr. 2007-OPT4, Asset-Baked Certificates, Series 2007-OPT4*, 2023 WL 2700721 at *4 (N.D. Tex. Mar. 29, 2023).   These Defendants, who have no contractual privity with FSCLE, are simply incorrect that the economic loss doctrine has any application to the claims asserted against them as indicated in *Suissi,* which was a wrongful foreclosure case between a borrower and lender who specifically had a contractual relationship.

The Texas Supreme Court explained how the economic loss rule works in Texas in *Sharyland Water Supply Corp. v. City of Alton,* confirming it has rare application outside of factual scenarios involving contractual privity between the parties to a suit. 354 S.W.3d 407, 415-19 (Tex. 2011). Originally, the economic loss rule was formulated to set perimeters in product liability cases. *Id.* at 415. Over time, it was expanded to preclude tort claims where plaintiffs suffered only economic losses and had a contractual remedy against the defendant. *Id.* at 415-17. The *Sharyland* court noted that the rule has only been applied to parties not in privity in the product liability context and that "we have never held it precludes recovery completely between contractual strangers in a case not involving a defective product…". *Id.* at 418. To say, as these Defendants argue, "that the economic loss rule 'preclude[s] tort claims between parties who are not in contractual privity' and that damages are recoverable only if they are accompanied by 'actual

---

[10] One or more of the Defendants which originally raised the economic loss doctrine abandoned the argument after FSCLE's original briefing on the issue.  Other Defendants persist in the argument.

physical injury or property damage' overlooks all of the tort claims for which courts have allowed recovery of economic damages even absent physical injury or property damage." *Id.* at 418 citing *Formosa Plastics Corp USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998).  In *Formosa*, the Texas Supreme Court held that claims sounding in fraud fall outside of the scope of the economic loss doctrine and do not bar the related tort claims.  *Id.* at 47.

Similarly, in the context of the Texas Civil Liability Theft Act, Texas courts have consistently held that where a contract exists but there is no present intention to perform the contract, a claim under the act may be made.  *Taylor v. State*, 450 S.W.3d 528, 536 (Tex. Crim. App. 2014); *AAB Logistics, Inc. v. Forward Air, Inc.*, 2016 WL 8672773, *4 (N.D. Tex. Nov. 18, 2016).  If the economic loss doctrine was as broad as claimed by the Defendants, the Taylor and AAB Logistics plaintiffs would have been denied recovery on the basis of the economic loss doctrine.  They were not. This is because *Sharyland* confirmed "[t]he economic loss rule does not swallow all claims between contractual and commercial strangers." *Sharyland,* 354 S.W.3d at 419.

Here, FSCLE is a contractual stranger to these Defendants and its claims absolutely sound in fraud and theft.  As detailed in the SAC, Defendants stole tens of millions from FSCLE by sending FSCLE more than 1,600 invoices, on and after November 3, 2021, with no intention by the Defendants to perform the services associated with those invoices and/or the related reversing transactions in which all but a small percentage of the money paid by FSCLE would be paid back to FSCLE.  TAC at ¶¶ 10, 23, 89, 118, 120, 121, 159, 160-192 & 217.  This scheme continued after Goodman Networks was internally declared to be defunct with the Defendants sending another 624 invoices to FSCLE after November 23, 2021.  TAC at ¶¶ 24, 138, 140, 159, 217 & 193-215.

Defendants affirmatively misled FSCLE as to why the reversing transactions (money back to FSCLE) were not happening.  TAC at ¶¶ 120, 130, 144 – 149, 152 & 157-158.  In response to the false narrative of the need to migrate the software platform, FSCLE even assigned IT personnel to help with the migration.  TAC at ¶¶ 152-153.  Employees at Goodman Networks reported being "uncomfortable" with what was happening, and the Defendants told them to continue anyway. TAC at ¶ 129-130, 141.  On November 19, 2021, Defendant Jody Goodman wrote an email saying that "we all agreed this would be for the best" referring to pulling funds from the 4352 account. TAC at ¶ 135.  When the alleged IT connectivity issue was resolved, FSCLE was told then (and only then) that there would be no reversing transactions.  TAC at ¶¶ 154-158.

The first scheme here was to steal funds from FSCLE by sending invoices to FSCLE pursuant to the funds flow with Goodman Networks with no intent to perform the reversing transactions all to build the cash balance that could then be laundered.  That is the essence of FSCLE's case.  As discussed in its Omnibus Response, FSCLE has pled with particularity the elements needed to establish its Theft Liability Act, conversion, unjust enrichment, fraud and civil conspiracy claims.  Under the Texas Supreme Court's holding in *Sharyland* and *Formosa*, the economic loss doctrine is no bar to these claims.

## VIII. Prosperity Bank's Liability to FSCLE as Assignee of the Goodman Networks Bankruptcy Estate.

Prosperity Bank has direct liability to FSCLE through its tortious actions and acts in violation of the RICO statute. Prosperity Bank is also liable to FSCLE as the assignee of the claims that the Goodman Networks bankruptcy estate could have brought against Prosperity Bank.  As part of an agreement between the bankruptcy trustee and FSCLE, the estate assigned its claims against Prosperity Bank to FSCLE.  TAC at ¶ 772.  Prosperity Bank does not seek to dismiss Count

8 (breach of contract against Prosperity Bank) or Count 9 (negligence against Prosperity Bank). Therefore, FSCLE will only address Count 10 (its UCC Article 4A Claim).[11]

Prosperity Bank is liable to FSCLE (as assignee of Goodman Networks) for the unauthorized wire transfers pursuant to TEX. BUS. & COM. CODE § 4A.202. Under Article 4A, where a bank executes an unauthorized wire transfer, it is liable to the customer for the loss. *Texas Brand Bank v. Luna & Luna, LP*, 2015 WL 12916411, at *2 (N.D. Tex. Feb. 27, 2015). However, if the security procedure established by the bank is commercially reasonable and the bank acted in good faith, the customer bears the loss of an unauthorized wire transfer. *Id*. The question of the reasonableness of Prosperity Bank's security procedure and whether Prosperity Bank failed to act in good faith, are not matters to be resolved on a motion to dismiss.

Rather, as pled in detail, Prosperity Bank knew that Goodman Networks could not validly authorize Frinzi to control the accounts. TAC at ¶¶ 90-93, 225, 232 & 241-242. Yet, Prosperity Bank knowingly accepted documents with unauthorized signatures, TAC at ¶¶108-111, and granted Frinzi unauthorized access to the 4352 account. TAC at ¶ 243. Thus, as pled, there was no security procedure or it was ignored and Prosperity Bank could not have acted in good faith.

In *Essilor International SAS v. JP Morgan Chase Bank, N.A.*, 650 F.Supp.3d 62, 78-82 (S.D.N.Y. 2023), the Southern District of New York denied a motion to dismiss on a UCC Article

---

[11] Prosperity Bank's Motion to Dismiss is particularly disingenuous. It leads with a list of acts it claims FSCLE did not plead and implies that lack of pleading is fatal to FSCLE's claims. *See* Dkt. No. 162 at pg. 4. But the list of acts includes conduct that is simply irrelevant. For example, FedEx did not need to be an owner of a Prosperity Bank account, have direct communications with the bank or have a contract with the bank in order for the bank to have RICO, theft, unjust enrichment or fraud liability to FSCLE. More importantly, the bank's list includes acts that were actually plead such as the bank's knowledge of the business between FSCLE and Goodman (TAC at ¶ 93), the bank's "meeting of the minds" with other defendants and intent to defraud FSCLE (TAC at ¶¶ 223-255) and with the bank's knowledge that the stolen funds belonged to FSCLE (TAC at ¶¶ 7, 80 & 93).

4A unauthorized wire claim where JP Morgan Chase argued, as Prosperity Bank does here, that the instructions to send wire transfers came from an insider and appeared from the perspective of the bank to be authorized.  The court held that the fact the wire transfer looked authorized did not make them authorized.  *Id.*  Further, it was no defense to UCC Article 4A that the actual security procedure was utilized to send the wire transfer if the security procedure was not otherwise commercially reasonable, and the bank did not act in good faith.  *Id.*  That is exactly what FSCLE has pled in this case – that the security procedure utilized by Prosperity Bank was not commercially reasonable and Prosperity Bank could not have acted in good faith when sending the unauthorized wires because Prosperity Bank gave Frinzi control over the 4352 account knowing there was no valid authorization to do so.  TAC at ¶¶ 821-841.  Just as in the *Essilor* case, Prosperity Bank's motion to dismiss FSCLE's UCC Article 4A claim must be denied.  The actual wire transfers sent in this case were unauthorized.

### IX.    Goodman Networks is Not a Necessary Party.

Defendants argue that Goodman Networks is a necessary party.  That is not so.  Rule 12(b)(7) allows dismissal for "failure to join a party under Rule 19."  FED. R. CIV. P. 12(b)(7); *HS Res., Inc. v. Wingate*, 327 F.3d 432, 438 (5th Cir. 2003). Rule 19 provides for the joinder of all parties whose presence in a lawsuit is required for the fair and complete resolution of the dispute at issue. *HS Res.*, 327 F.3d at 438. It further provides for the dismissal of litigation that should not proceed in the absence of parties that cannot be joined. *Id.* The party advocating joinder has the initial burden of demonstrating that a missing party is necessary. *Hood ex rel. Ms. v. City of Memphis, Tn.*, 570 F.3d 625, 628 (5th Cir. 2009).

The Rule 12(b)(7) analysis entails two inquiries under Rule 19. *HS Res.*, 327 F.3d at 439. First, the court must determine whether a person or entity should be joined to the lawsuit. *Id.*; *see* FED. R. CIV. P. 19(a).  Rule 19(a) provides that a person who is subject to service of process and

whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if: 1) in that person's absence, the court cannot accord complete relief among existing parties; or 2) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may either a) impair or impede the person's ability to protect the interest or b) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.  FED. R. CIV. P. 19(a).  If joinder is warranted, then the person or entity will be brought into the lawsuit. *HS Res.*, 327 F.3d at 439.

If such joinder would destroy the court's jurisdiction, then the court must determine under Rule 19(b) whether to press forward without the person or entity or whether to dismiss the litigation. *Id.*  Factors to consider under Rule 19(b) include: 1) prejudice to an absent party or others in the lawsuit from a judgment; 2) whether the shaping of relief can lessen prejudice to absent parties; 3) whether adequate relief can be given without participation of the party; and 4) whether the plaintiff has another effective forum if the suit is dismissed. *Id.*

Here, Goodman Networks is bankrupt and cannot be joined as a party in this case absent relief from the automatic stay that will not be granted.  Further, at this point, FSCLE, the bankruptcy trustee, certain bondholders and other creditors have reached an agreement, approved by the bankruptcy court, that has confirmed the proof of claim FSCLE has against Goodman Networks.  None of the Defendants in this case have asserted any proof of claim against Goodman Networks other than a seeking relief from the stay to obtain potential indemnification and representation from the directors and officers liability policy in place.  Further, there is no requirement to sue all members of a conspiracy.  See *Xie Law Offices, LLC v. Nguyen & Chen, LLP*, 2018 WL 3468718, at *5 (S.D. Tex. June 28, 2018).  Finally, fundamentally, it was the Defendants who perpetrated the harm in this case.  Goodman Networks was functionally defunct

at the time the fraudulent invoices were sent, lacked the requisite number of directors to take valid action and was a shell used to perpetrate the theft, fraud and other unlawful acts. Goodman Networks is not a necessary party.

## X.    The Claims Against Judith Auerbach are Timely Filed.

Auerbach argues that FSCLE allegedly missed the two-year statute of limitation as to Judith Auerbach.  Of course, Auerbach completely fails to address or acknowledge the fact that the addition of Judith Auerbach as Trustee of the Auerbach Trusts in the Second Amended Complaint relates back to the date of the original filing which is well within the two-year statute of limitation.  See. Fed. R. Civ. P. 15(c).  Under Rule 15(c) of the Federal Rules of Civil Procedure, an amendment naming a new party relates back for purposes of the statute of limitation analysis if either state law permits the relation back or the amendment relates to the same transaction or occurrence in the original complaint, the new party is served within the period set forth in Rule 4(m), the party received notice of the original complaint, would not be prejudiced in defending on the merits and knew or should have known that they would otherwise be named but for a mistake in the identity of the proper parties.  *Id*.; *Brown v. Johnson & Johnson*, 2012 WL 2134304, *5 (N.D. Tex. Apr. 19, 2012).

Here, Auerbach Partners has been a defendant since the original complaint.  The Auerbach Trusts are the members/partners in that entity.  However, FSCLE did not and could not have known that.  The addition of the Auerbach Trusts simply clarifies the ultimate beneficiary of the stolen FSCLE funds, arises from the same transaction, and the Auerbach Trusts were on notice as of the date of the original complaint.  They do not argue actual prejudice and the amendments relate back.

## XI.    The Court Has Personal Jurisdiction Over All Defendants.

RICO provides nationwide service of process and personal jurisdiction "when the ends of justice require."  18 U.S.C. § 1965(b); *Rolls-Royce Corp. v. Heros, Inc.*, 576 F.Supp. 2d 765, 781

(N.D. Tex. 2008).  Even outside of a RICO analysis, most of the Defendants (certainly all of the Goodman Defendants and Prosperity Bank) reside in Texas and were connected to Goodman Networks which was located in the district.  As to the Auerbach Defendants and those associated with them, they directed their activities towards Texas including the coordination of the various schemes and plans to strip the money out of companies and then to launder the stolen funds.  See e.g. TAC at ¶¶ 258, 300, 305-307 & 319-320.  Thus, there is personal jurisdiction over all of the Defendants whether through a RICO analysis or through a traditional personal jurisdiction analysis.

## CONCLUSION

Through discovery in the bankruptcy case, FSCLE obtained thousands of documents which allowed it to plead in detail what happened in this case.  That detailed Third Amended Complaint more than satisfies the pleading standards to overcome Defendants' motions to dismiss.  FSCLE has set forth a plausible RICO claim as well as the various state law causes of action in its Third Amended Complaint.  FSCLE should be permitted to move forward to remedy the wrongs done to it.  Alternatively, FSCLE should be granted leave to amend its complaint to address any possible pleading deficiencies that might concern the Court.

89786462.v2